SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No.  CR-07-0048-AP |
| Appellee, | ) | |
| | ) | Maricopa County |
| v. | ) | Superior Court |
| | ) | No.  CR2003-024938-001 |
| PATRICK WADE BEARUP, | ) | |
| | ) | |
| Appellant. | ) | **O P I N I O N** |
| _____ | ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Warren J. Granville, Judge

**AFFIRMED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
     By   Kent E. Cattani, Chief Counsel
          Criminal Appeals, Capital Litigation Section
          Deborah A. Bigbee, Assistant Attorney General
Attorneys for State of Arizona

MICHAEL J. DEW ATTORNEY AT LAW                             Phoenix
     By   Michael J. Dew
Attorneys for Patrick Wade Bearup
_____

**B E R C H**, Chief Justice

¶1      Patrick Wade Bearup was convicted of one count of kidnapping and one count of first degree murder, for which he was sentenced to death.  In this automatic appeal, Bearup raises four claims of error and lists thirteen additional issues to

- 1 -

avoid preclusion.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

¶2        In February 2002, Jessica Nelson discovered money missing from her room.  She suspected that Mark Mathes, another resident of the home, had taken it.  She called Sean Gaines and told him of her suspicion; Gaines instructed her to call back when Mark returned home.

¶3        Following the conversation, Nelson told Bruce and Marie Mathes, the owners of the home, that Gaines and "the boys" – Jeremy Johnson and Patrick Bearup – were going to confront Mark about the missing money.  Bruce and Marie expected Mark to receive a "butt whooping" when Gaines, Johnson, and Bearup arrived.  Bruce asked Nelson to retrieve a ring he had previously given Mark as a present.  When Mark returned home that evening, Nelson called Gaines and told him that Mark was back.  She then alerted Bruce and Marie that "the boys" were coming, so Bruce left the residence with his daughters.

¶4        After receiving Nelson's call, Gaines and Johnson armed themselves and left for Nelson's house.  According to Johnson, they brought weapons because they "knew there was going to be a confrontation" and they were going "[t]o take care of business."

¶5        On the way, Gaines and Johnson stopped at a convenience

_____

[1]    The thirteen claims listed to avoid preclusion are appended to this opinion.

- 2 -

store to meet Bearup.  As the men got back in their cars, Bearup proclaimed, "Let's go play, boys."  Johnson understood this statement to mean they were going to "[c]ause trouble."

¶6        The three men got out of their vehicles and approached the Mathes home.  Gaines carried a loaded shotgun, Johnson had an aluminum baseball bat, and Bearup had a folding knife with a nine- or ten-inch blade.  They advanced across the backyard toward Mark, who was sitting on the rear patio with Nelson.

¶7        Bearup, Johnson, and Gaines surrounded Mark.  Johnson attacked Mark with the baseball bat, striking him in the head and upper torso as many as twenty-five times.  Bearup maintained his location throughout the assault, preventing Mark from leaving.

¶8        The witnesses disagreed about whether Mark was alive following the beating.  Nelson was certain that Mark was killed on the patio, while Johnson claimed that Mark was still conscious and groaning.  After the attack, Johnson and Bearup dragged Mark to one of the cars and stuffed him in the trunk. Bearup kicked Mark's head to make him fit into the trunk.

¶9        The four perpetrators got into two vehicles – Bearup and Nelson in Bearup's car and Johnson and Gaines in the vehicle containing Mark's body – and drove to an isolated area near Crown King.  Johnson testified that he heard Mark mumbling and moaning in the trunk during the drive.

- 3 -

¶10     When the cars stopped on Crown King Road, Bearup pulled Mark from the trunk. Gaines and Nelson stripped him to make the body more difficult to identify. Nelson was unsuccessfully attempting to remove Mark's ring when Bearup approached and cut off the finger with a pair of wire clippers. Mark was then thrown over the guardrail and, as he lay in the ravine below, Gaines shot him twice.

¶11     The assailants then returned to their vehicles and departed for Phoenix. Bearup stopped at a gas station and then drove Nelson home. Once there, Nelson returned the ring to Marie, and Bearup told Marie that she did not have to file a missing person's report because Mark would never be found.

¶12     In February 2002, Bearup told his ex-wife, Sheena Ramsey, that he had gone with friends to beat up a man who had stolen a ring, but the person was killed and he helped dispose of the body. Bearup also told an ex-girlfriend about the killing. She overheard Bearup laughing as he talked about cutting off the victim's finger, and he seemed amused when he told her about the act.

¶13     Bearup was indicted on one count of first degree murder and one count of kidnapping. The State alleged two aggravating factors: a previous conviction for a serious offense, Ariz. Rev. Stat. ("A.R.S.") § 13-703(F)(2) (2001), and the commission of the offense in an especially heinous, cruel, or depraved

- 4 -

manner, *id.* § 13-703(F)(6).

¶14     At trial, Bearup presented alibi and mistaken identity defenses.  The jury convicted him of first degree murder and kidnapping and found both the (F)(2) and (F)(6) aggravating factors.  The jury determined that the mitigation was not sufficiently substantial to call for leniency and returned a verdict of death for the murder.  This automatic appeal followed.  *See* Ariz. R. Crim. P. 31.2(b).  We have jurisdiction pursuant to Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 13-4031 (2001).

## II.  DISCUSSION

### A.   Trial Issues

#### 1.   Sufficiency of the evidence to support kidnapping

¶15     Bearup contends that the State presented insufficient evidence of kidnapping, which served as the predicate felony for the felony murder conviction.  He argues that the State did not show that he intended to inflict death or physical injury as required under A.R.S. § 13-1304(A)(3) (2001), which defines kidnapping as "knowingly restraining another person with the intent to . . . [i]nflict death [or] physical injury . . . or to otherwise aid in the commission of a felony."  Bearup concedes that the evidence showed restraint, but argues that it did not establish that he intended to murder or physically injure Mark or "to otherwise aid in the commission of a felony" such as

- 5 -

aggravated assault.

**¶16** We review a sufficiency of the evidence claim by determining "whether substantial evidence supports the jury's finding, viewing the facts in the light most favorable to sustaining the jury verdict." *State v. Roque*, 213 Ariz. 193, 218, ¶ 93, 141 P.3d 368, 393 (2006) (citing *State v. Roseberry*, 210 Ariz. 360, 368-69, ¶ 45, 111 P.3d 402, 410-11 (2005)). Substantial evidence is proof that "reasonable persons could accept as adequate . . . to support a conclusion of defendant's guilt beyond a reasonable doubt." *State v. Jones*, 125 Ariz. 417, 419, 610 P.2d 51, 53 (1980). We resolve any conflicting evidence "in favor of sustaining the verdict." *State v. Guerra*, 161 Ariz. 289, 293, 778 P.2d 1185, 1189 (1989). "Criminal intent, being a state of mind, is shown by circumstantial evidence. Defendant's conduct and comments are evidence of his state of mind." *State v. Routhier*, 137 Ariz. 90, 99, 669 P.2d 68, 77 (1983).

**¶17** Substantial evidence supports the jury finding that Bearup intended to participate in inflicting injury on Mark. When leaving the convenience store before the attack, Bearup said, "Let's go play, boys." Bearup, Gaines, and Johnson went to the home armed with weapons. Bearup displayed a long-bladed knife as the assailants approached and surrounded Mark in a forceful and intimidating fashion, and he stood only a few feet

away as Mark was severely beaten, never intervening or protesting the length or severity of the beating.

¶18 Other evidence also suggested the understanding by all participants that Nelson's call to "the boys" would result in an assault on and injury to Mark. Bruce and Marie testified that after Nelson told them that she called "the boys," they expected that Mark would receive a "butt whooping." Indeed, Bruce left the house with his daughters when the beating was expected to occur so they would not be exposed to it. Joe Mathes, another resident of the house, also stated that he knew that Mark was going to be beaten based on what Nelson told him. Finally, Bearup confessed to his ex-wife, Sheena Ramsey, that he went "with some friends to beat up somebody."

¶19 This testimony provides substantial support for the jury's determination that Bearup intended to injure or assist the group in injuring Mark while confining him to the patio.

## 2. Lesser-included offense instruction

¶20 Bearup argues that the trial judge committed fundamental error by failing to give an unlawful imprisonment instruction. Although the judge instructed the jury on felony murder, kidnapping, and attempted kidnapping, he did not give, and Bearup did not request, an instruction on the lesser-included offense of unlawful imprisonment. *See* A.R.S. § 13-1303(A) (2001). Had Bearup been convicted of unlawful

imprisonment rather than kidnapping, he could not have been convicted of felony murder because unlawful imprisonment is not a predicate crime for felony murder. *See* A.R.S. § 13-1105(A)(2) (2001) (listing felony murder predicate crimes).

### a.   *Standard of review*

¶21      We review assignments of trial error for fundamental error if the defendant fails to object. *State v. Henderson*, 210 Ariz. 561, 567, ¶ 19, 115 P.3d 601, 607 (2005). To be fundamental, an error must "go[] to the foundation of the case, . . . take[] from the defendant a right essential to his defense," or be so significant "that the defendant could not possibly have received a fair trial." *Id.* (quoting *State v. Hunter*, 142 Ariz. 88, 90, 688 P.2d 980, 982 (1984)). The defendant bears the burden to establish that "(1) error exists, (2) the error is fundamental, and (3) the error caused him prejudice." *State v. Smith*, 219 Ariz. 132, 136, ¶ 21, 194 P.3d 399, 403 (2008) (citing *Henderson*, 210 Ariz. at 567, ¶ 20, 115 P.3d at 607).

¶22      Because Bearup did not request an unlawful imprisonment instruction at trial or object to the absence of one, we review only for fundamental error. *See State v. Dickens*, 187 Ariz. 1, 22-23, 926 P.2d 468, 489-90 (1996). A "sentence of death may not be imposed if the jury was not permitted to consider a lesser-included, non-capital offense" that would have been

supported by the evidence.  *State v. Nordstrom*, 200 Ariz. 229, 253, ¶ 81, 25 P.3d 717, 741 (2001) (citing *Beck v. Alabama*, 447 U.S. 625, 627 (1980)).

        *b.    Analysis*

**¶23**      A lesser-included offense instruction is not required in every case; it is appropriate only if the facts support giving the instruction.  *See State v. Wall*, 212 Ariz. 1, 4, ¶ 17, 126 P.3d 148, 151 (2006).  To determine whether sufficient evidence existed to require a lesser-included offense instruction, the court must examine "whether the jury could rationally fail to find the distinguishing element of the greater offense."  *State v. Detrich*, 178 Ariz. 380, 383, 873 P.2d 1302, 1305 (quoting *State v. Noriega*, 142 Ariz. 474, 481, 690 P.2d 775, 782 (1984), *overruled on other grounds*, *State v. Burge*, 167 Ariz. 25, 804 P.2d 754 (1990)).  Thus, a lesser-included offense instruction is required if the jury could "find (a) that the State failed to prove an element of the greater offense and (b) that the evidence is sufficient to support a conviction on the lesser offense."  *Wall*, 212 Ariz. at 4, ¶ 18, 126 P.3d at 151 (citing *State v. Caldera*, 141 Ariz. 634, 636-37, 688 P.2d 642, 644-45 (1984)).

**¶24**      Unlawful imprisonment, a lesser-included offense of kidnapping, is defined as "knowingly restraining another person."  A.R.S. § 13-1303(A); *see State v. Bolton*, 182 Ariz.

290, 309, 896 P.2d 830, 849 (1995). We therefore must determine whether evidence was presented from which a rational jury could find that Bearup simply intended to restrain Mark, *see State v. Trostle*, 191 Ariz. 4, 16, 951 P.2d 869, 881 (1997); *Detrich*, 178 Ariz. at 383, 873 P.2d at 1305, but not to inflict death or physical injury or to aid Johnson and Gaines in doing so. *See Wall*, 212 Ariz. at 5, ¶ 20, 126 P.3d at 152.

¶25    We conclude that the trial court's failure to give the unsolicited instruction did not constitute fundamental error. Once the beating commenced and Bearup continued to restrain Mark, no reasonable jury could have found that he merely intended to restrain Mark.

¶26    Our conclusion that no fundamental error occurred is supported by the alibi and mistaken identity defenses Bearup asserted at trial. His defense was "all or nothing"; he claimed not to have been present during the assault on Mark or for the subsequent attempt to conceal the crime. We recognize that a trial court is not automatically precluded from instructing on a lesser-included offense because a defendant elects to present an all-or-nothing defense. *Id.* at 6, ¶ 28, 126 P.3d at 153. "As a practical matter, [however,] when a defendant asserts an all-or-nothing defense such as alibi or mistaken identity, there will 'usually [be] little evidence on the record to support an instruction on the lesser included offenses.'" *Id.* at ¶ 29

- 10 -

(second alteration in original) (quoting *Caldera*, 141 Ariz. at 637, 688 P.2d at 645). Such is the case here.

¶27 This Court has required lesser-included offense instructions in cases in which the defendant asserted a mere presence defense. *See id.* at 5-6, ¶¶ 22, 31, 126 P.3d at 152-53; *State v. Dugan*, 125 Ariz. 194, 195-96, 608 P.2d 771, 772-73 (1980). But in those cases, the defendants each testified at trial regarding their lack of involvement in the crimes in a manner that created a factual dispute for the jury to consider. *See Wall*, 212 Ariz. at 2, ¶ 7, 126 P.3d at 149; *Dugan*, 125 Ariz. at 196, 608 P.2d at 773. Here, no such factual dispute existed. Bearup asserted that he was not present for the commission of this crime and consequently lacked the mental state for kidnapping. If the jurors believed that Bearup was not present, then they would not have found him guilty. They could not then have believed that he had the mental state to support unlawful imprisonment, but not kidnapping. *See Bolton*, 182 Ariz. at 310, 896 P.2d at 850; *see also State v. Salazar*, 173 Ariz. 399, 408, 844 P.2d 566, 575 (1992) ("Because defendant's theory of the case denies all involvement in the killing, and no evidence provides a basis for a second degree murder conviction, the instruction was properly refused."). Based on the evidence and defenses presented, the jury could not have acquitted Bearup on the greater offense of kidnapping, yet found him guilty of

- 11 -

unlawful imprisonment.

¶28    Bearup also urges that the policy reasons enunciated by the Supreme Court in *Beck v. Alabama* compelled the trial court to give an unlawful imprisonment instruction. 447 U.S. 625 (1980). In *Beck*, the Court analyzed Alabama's death penalty statute, which prohibited judges from instructing jurors on the lesser-included offense of felony murder when the defendant was charged with a capital offense. *Id.* at 628. Beck was charged with robbery involving an intentional killing and, although the State conceded that the evidence at trial was sufficient to entitle him to a lesser-included offense instruction on felony murder, because of the statutory prohibition, the trial court refused to give that instruction. *Id.* at 627-28, 630. The Supreme Court reversed because it feared that

> when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense - but leaves some doubt with respect to an element that would justify conviction of a capital offense - the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted [capital] conviction.

*Id.* at 637. Thus, the Court held that the jury must be given the opportunity to consider a verdict of guilt on a lesser-included offense because the inability to do so enhanced the risk of an unwarranted conviction for a capital crime. *Id.* at 638, 642-43.

- 12 -

¶29        "*Beck*[, however,] does not require a trial court to instruct on a lesser offense that is unsupported by the evidence." *State v. Landrigan*, 176 Ariz. 1, 6, 859 P.2d 111, 116 (1993).  Unlike the situation in *Beck*, in which the evidence created some doubt with respect to an element of the capital offense, the evidence against Bearup supported only the offense of kidnapping – or total innocence if the jurors believed that Bearup in fact was not present during the commission of the crime.

¶30        Bearup argues that, like Beck, he faced mandatory imposition of a death sentence because he had advised the trial judge during the guilt phase of the trial that he would not present mitigation evidence during the sentencing phase; thus, if convicted, he would essentially receive a directed verdict of death.  But Bearup placed himself in that situation by declining to present any mitigation evidence.  Importantly, although the trial judge knew of Bearup's decision, the jury did not know during the guilt phase of his choice to waive mitigation, and in the sentencing phase, the judge instructed the jury that it could consider mitigating evidence from the other phases of the trial and the lesser sentences faced by Johnson and Nelson. These factors eliminated the concern expressed in *Beck* that the jury's knowledge that a guilty verdict would automatically result in a death sentence "interject[ed] irrelevant

- 13 -

considerations into the factfinding process, diverting the jury's attention from the central issue of whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant [was] guilty of a capital crime." *Beck*, 447 U.S. at 642.

¶31 In sum, Bearup had the opportunity at trial to request an unlawful imprisonment instruction or object to its absence, but failed to do either. We conclude that, given Bearup's alibi and mistaken identity defenses, the lack of an unlawful imprisonment instruction did not go to the foundation of his case, take away a right essential to his defense, or prevent him from receiving a fair trial. *See Henderson*, 210 Ariz. at 567, ¶ 19, 115 P.3d at 607. Therefore, the trial court did not fundamentally err by failing to instruct the jury on unlawful imprisonment.[2]

## B. Aggravation Issue: Sufficiency of the evidence to support the *Enmund/Tison* findings

¶32 Bearup argues that insufficient evidence supported the jury's *Enmund/Tison* findings.

¶33 The Eighth Amendment prohibits the imposition of the death penalty on a defendant unless he "himself kill[s], attempt[s] to kill, or intend[s] that a killing take place or

---

[2] Because we do not find fundamental error, we need not address prejudice. *See Smith*, 219 Ariz. at 136, ¶ 21, 194 P.3d at 403.

- 14 -

that lethal force will be employed," *Enmund v. Florida*, 458 U.S. 782, 797 (1982), or is a major participant in the crime and acts "with reckless indifference to human life," *Tison v. Arizona*, 481 U.S. 137, 158 (1987). The prosecutor in this case acknowledged that Bearup acted as an accomplice to the murder and conceded that no evidence showed "that Bearup inflicted the death wound." Therefore, to make Bearup eligible for a capital sentence, the State had to prove beyond a reasonable doubt that Bearup intended the murder or was a major participant in the crime who acted with reckless indifference to the harm to Mark. *See id.; Enmund*, 458 U.S. at 801; *State v. Tison*, 160 Ariz. 501, 502 (1989). The jury found all of these factors.

### 1. Major participant

¶34 Sufficient evidence supports the jury's finding that Bearup was a major participant in the crime. *See Tison*, 481 U.S. at 157-58. Armed with a knife, Bearup joined Gaines and Johnson in encircling Mark to prevent him from leaving as Johnson administered a savage beating. By these actions, Bearup substantially participated in the kidnapping. *See* A.R.S. §§ 13-1301(2), -1304(A) (2001).

¶35 Bearup did far more than "merely sitting in a car away from the actual scene of the murders acting as the getaway driver." *See Tison*, 481 U.S. at 158. He was "actively involved in every element of the [kidnapping] and was physically present

during the entire sequence of criminal activity culminating in" Mark's murder and the subsequent disposal of his body near Crown King. *See id.* Therefore, the record contains sufficient evidence to support the jury's finding that Bearup was a major participant in the kidnapping.

### 2. Reckless indifference

¶36 The jury also found that Bearup acted with reckless indifference to human life. *See id.* at 157-58. Reckless indifference is characterized by "knowingly engaging in criminal activities known to carry a grave risk of death." *Id.* at 157. Bearup argues that he was not reckless because he was present only to intimidate Mark and did not anticipate that Mark would be killed.

¶37 Bearup cites *State v. Lacy*, 187 Ariz. 340, 929 P.2d 1288 (1996), in support of his contention that the record contains insufficient evidence that he acted with reckless indifference to life. *Lacy* involved a burglary and double murder in which the defendant denied any involvement in restraining or harming the victims. *Id.* at 345, 929 P.2d at 1293. In that case, without the defendant's testimony, there was "an almost complete void as to what occurred that night." *Id.* at 352, 929 P.2d at 1300. Because the record contained almost no evidence indicating what the defendant saw, knew, or did, except for his statement that he was not present when one

- 16 -

of the victims was bound and gagged, we found the evidence insufficient to support the conclusion that the defendant was recklessly indifferent. *Id.* at 353, 929 P.2d at 1301.

¶38    The situation here differs. Bearup's case is more like *State v. Ellison*, a case in which we found reckless indifference. 213 Ariz. 116, 135, ¶ 73, 140 P.3d 899, 918 (2006). In *Ellison*, the defendant argued that he was not the actual killer and that he participated in the murder under duress. *Id.* at 124, 135, ¶¶ 10, 73, 140 P.3d at 907, 918. On appeal, citing *Lacy*, Ellison argued that the State failed to prove that he acted with reckless indifference. *Id.* at 135, ¶ 73, 140 P.3d at 918. We distinguished the cases because "[t]he defendant in *Lacy* . . . was not present when the actual killer bound and gagged the victim; he only witnessed the killing afterwards," whereas Ellison "was not merely present during the burglary and subsequent murders," but directly participated in restraining the victims and smothering one of them. *Id.* We held that a reasonable jury could have concluded that Ellison acted with reckless indifference to the fate of the victims. *Id.*

¶39    We similarly upheld the murder convictions of two defendants, Robinson and Washington, who killed one person and severely injured another during a home invasion. *State v. Robinson*, 165 Ariz. 51, 54-55, 796 P.2d 853, 856-57 (1990).

- 17 -

Although it was unclear from the evidence who actually committed the murder, we examined whether each defendant's participation in the felony was major and was done with reckless indifference to life. *Id.* at 62, 796 P.2d at 864. We determined that the *Enmund/Tison* culpability requirement was met for both defendants based on

> [e]vidence . . . that Robinson loaded firearms into his vehicle in preparation for the trip from [California] to Yuma, that Washington was at least present when the hands and feet of [the victims] were bound, that the [victims] were terrorized with firearms, that Robinson masterminded the trip, and that Washington was at least present in the [victims'] home when [one victim] was wounded and [the other victim] was murdered.

*Id.* In addition, Washington stated that he knew beforehand that it might be necessary to kill the residents, he carried a gun into the victims' home and helped ransack it, and he did nothing to prevent the victims from being shot. *Id.* at 61-62, 796 P.2d at 863-64.

¶40    The circumstances surrounding Mark's murder are more like the facts in *Ellison* and *Robinson* than those in *Lacy*. Unlike the situation in *Lacy*, in which little was known of the events of the crime, Johnson and Nelson provided detailed accounts of Bearup's conduct. Both testified that Bearup was not merely present, but actively participated in Mark's kidnapping and murder.

¶41    Even assuming that Bearup went to the scene intending

- 18 -

only to intimidate Mark, the facts support the jury's finding that he thereafter acted with reckless indifference to whether his acts, along with those of Johnson and Gaines, were likely to result in Mark's death. *See Tison*, 481 U.S. at 152. At some point during the armed assault, Bearup must have realized that Mark's life was at risk. From this evidence, the jury reasonably found that Bearup knew his actions created a grave risk of death. *Cf. Lacy*, 187 Ariz. at 351, 929 P.2d at 1299 (recognizing that in the absence of other evidence, failure to render aid may not suffice to show reckless indifference).

¶42 The evidence here showed that Bearup also participated in and helped coordinate the post-beating activities, which culminated in dumping Mark's body. These actions as well demonstrate reckless indifference. Bearup helped confine Mark to the trunk of a car, cut off Mark's finger while he might still have been alive, and helped throw Mark's body into the ravine without verifying whether he was alive and while he was at least seriously injured.

¶43 Viewing the facts in the light most favorable to sustaining the verdict, we conclude that substantial evidence demonstrated Bearup's reckless indifference to human life; thus, sufficient evidence supported the jury's *Enmund/Tison* findings.

### III. REVIEW OF SENTENCE

¶44 Because Bearup's crimes occurred before August 1, 2002,

- 19 -

we independently review the aggravating and mitigating factors and the propriety of the death sentence.  A.R.S. § 13-703.04(A) (Supp. 2008); *see* 2002 Ariz. Sess. Laws, ch. 1, § 7 (5th Spec. Sess.).  In conducting our independent review, we "consider the quality and the strength, not simply the number, of aggravating and mitigating factors."  *Roque*, 213 Ariz. at 230, ¶ 166, 141 P.3d at 405 (quoting *State v. Greene*, 192 Ariz. 431, 443, ¶ 60, 967 P.2d 106, 118 (1998)).

## A.    Aggravating Circumstances

**¶45**     The State alleged two aggravating factors:  Bearup had previously been convicted of aggravated assault, a serious offense in violation of A.R.S. § 13-703(F)(2), and he murdered Mark in an especially cruel, heinous, and depraved manner in violation of § 13-703(F)(6).  Both aggravating factors were proved beyond a reasonable doubt.

**¶46**     For the (F)(2) aggravator, the State produced a certified copy of Bearup's conviction for aggravated assault and presented testimony that Bearup was in fact the person convicted.  Bearup concedes that aggravated assault qualifies as a serious offense.  This evidence establishes the "prior serious offense" aggravating factor.

**¶47**     For the (F)(6) aggravating factor, the jury found both that the murder was especially cruel and that it was committed in an especially heinous or depraved manner.  We find both

- 20 -

elements satisfied as well.

¶48    "Cruelty exists if the victim consciously experienced physical or mental pain prior to death and the defendant knew or should have known that suffering would occur."  *Trostle*, 191 Ariz. at 18, 951 P.2d at 883 (citation omitted).  "Mental anguish includes a victim's uncertainty about [his] ultimate fate."  *State v. Kiles*, 175 Ariz. 358, 371, 857 P.2d 1212, 1225 (1993).

¶49    The evidence established that Mark experienced physical pain and mental anguish and that Bearup knew of his suffering. After Johnson began bludgeoning Mark with the baseball bat, Mark attempted to stand up and may have tried to use Nelson to shield himself from the assault.  Mark screamed, "No.  Leave me alone," and somebody else yelled, "Get him."  The assault lasted between sixty and ninety seconds, during which time Mark was severely beaten, resulting in visible facial fractures and substantial blood loss.  This evidence establishes cruelty.  *See id.* at 371-72, 857 P.2d at 1225-26; *State v. Amaya-Ruiz*, 166 Ariz. 152, 177, 800 P.2d 1260, 1285 (1990).

¶50    The record also shows that the murder was especially heinous or depraved.  Bearup relished the murder and either mutilated the corpse or committed gratuitous violence.  *See State v. Carlson*, 202 Ariz. 570, 583-84, ¶ 51, 48 P.3d 1180, 1193-94 (2002) (citing *State v. Gretzler*, 135 Ariz. 42, 52-53,

659 P.2d 1, 11-12 (1983)) (listing factors used to establish heinousness and depravity).

¶51     "Mutilation requires a finding of a separate purpose to mutilate" a corpse. *Id.* at 584, ¶ 52, 48 P.3d at 1194. In this case, Bearup cut off Mark's finger to recover the ring Mark was wearing, which was a purpose separate from the killing itself. Such "purposeful severing of body parts" constitutes mutilation. *State v. Doerr*, 193 Ariz. 56, 68, ¶ 55, 969 P.2d 1168, 1180 (1998).

¶52     Gratuitous violence occurs when the defendant uses violence in addition to that necessary to kill and intends to inflict such violence. *State v. Bocharski*, 218 Ariz. 476, 494, ¶¶ 85, 87, 189 P.3d 403, 421 (2008). It may be demonstrated by the continued infliction of violence after the defendant knew or should have known that a fatal action had occurred. *Id.* Removing Mark's finger after he had been beaten nearly to death with an aluminum baseball bat exceeded the violence necessary to kill. Bearup's actions also occurred after he knew or should have known that Mark would not survive.

¶53     Although the record is not clear regarding when Mark died, cutting off Mark's finger approximately an hour after the original assault constituted either mutilation (if Mark was dead at the time) or gratuitous violence (if Mark was alive at the time). *See, e.g.*, *State v. Pandeli* (*Pandeli I*), 200 Ariz. 365,

376, ¶ 41, 26 P.3d 1136, 1147 (2001) (removing victim's nipples after death constituted mutilation), *vacated on other grounds*, 536 U.S. 953 (2002) (mem.). The State thus established heinousness and depravity beyond a reasonable doubt.

¶54    The State also established that Bearup relished the crime. Bearup was overheard laughing while talking about cutting off a person's finger and was amused when he told his ex-girlfriend about his actions. *See supra* ¶ 12; *see also State v. Medina*, 193 Ariz. 504, 514, ¶ 35, 975 P.2d 94, 104 (1999) (relishing demonstrated by defendant "laughing out loud," joking, and looking forward to media coverage); *State v. West*, 176 Ariz. 432, 448, 862 P.2d 192, 208 (1993) (bragging about beating victim shows that defendant relished his crime), *overruled on other grounds*, *State v. Rodriguez*, 192 Ariz. 58, 64 n.7, ¶ 30, 961 P.2d 1006, 1012 n.7 (1998); *State v. Runningeagle*, 176 Ariz. 59, 65, 859 P.2d 169, 175 (1993) (laughing immediately after murder and bragging to girlfriend constitute relishing); *cf. Greene*, 192 Ariz. at 441, ¶ 40, 967 P.2d at 116 (noting that bragging may provide "sufficient proof of relishing where the defendant's statements provide clear insight into his state of mind at the time of the killing").

¶55    Therefore, the State proved beyond a reasonable doubt that the murders were especially cruel and especially heinous or depraved.

## B. Mitigating Circumstances

¶56     Bearup represented himself during the penalty phase and elected not to present any mitigation evidence.[3]   He contends that we should consider his decision to waive mitigation during the penalty phase and his comparatively minor participation in the crime.  *See* A.R.S. § 13-703(G)(3).

¶57     Bearup's chief argument, however, is that the disparity between his sentence and Johnson's and Nelson's sentences is a mitigating factor sufficiently substantial to warrant leniency. During the guilt phase, Nelson testified that, under her plea agreement, she was sentenced to ten and one-half years in prison for kidnapping and she was eligible to receive a ten-to-twenty year sentence for second degree murder.   Johnson likewise testified that, under his plea agreement, he was sentenced to twelve years for kidnapping and was eligible to receive a ten-

---

[3]   On several occasions, the trial court conducted a colloquy and determined that Bearup knowingly, intelligently, and voluntarily waived his right to counsel and to present mitigation evidence during the penalty phase. *See Faretta v. California*, 422 U.S. 806, 835 (1975); *State v. Hampton*, 208 Ariz. 241, 243-44, ¶ 7, 92 P.3d 871, 873-74 (2004); *see also State v. Ashworth*, 706 N.E.2d 1231, 1237 (Ohio 1999) (requiring the trial court to inquire if the waiver of all mitigating evidence in a capital case is knowing, voluntary, and competent).  *But see Schriro v. Landrigan*, 550 U.S. 465, 479 (2007) ("We have never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce [mitigation] evidence.").

to-twenty-two year sentence for second degree murder.

¶58    In September and October 2008, more than eighteen months after Bearup was sentenced to death, the same trial judge sentenced Johnson and Nelson to fourteen years' incarceration for Mark's murder, each sentence to run concurrently with their kidnapping sentences; thus each received a sentence totaling fourteen years.  *See State v. Valenzuela*, 109 Ariz. 109, 110, 506 P.2d 240, 241 (1973) (allowing judicial notice of the superior court records).  Gaines has entered a plea agreement, but has yet to be sentenced.

¶59    "A disparity in sentences between codefendants and/or accomplices can be a mitigating circumstance if no reasonable explanation exists for the disparity."  *State v. Kayer*, 194 Ariz. 423, 439, ¶ 57, 984 P.2d 31, 47 (1999).  "Only the unexplained disparity is significant."  *Ellison*, 213 Ariz. at 140, ¶ 105, 140 P.3d at 923 (emphasis omitted).  Here, however, the plea deals with Johnson and Nelson were explained as being necessary to bring everyone in this killing to justice.  And because the jury found the murder especially cruel, heinous, or depraved, "even unexplained disparity has little significance."  *Id.* (quoting *State v. Schurz*, 176 Ariz. 46, 57, 859 P.2d 156, 167 (1993)).

¶60    Bearup contends that we should compare his sentencing disparity to the disparity in *State v. Marlow*, 163 Ariz. 65, 786

P.2d 395 (1989). There, the defendant was sentenced to death while his codefendant, who was also originally charged with first degree murder, received a four-year sentence. *Id.* at 71-72, 786 P.2d at 401-02. A probation officer testified that the codefendant's sentence was a "travesty of justice." *Id.* at 71, 786 P.2d at 401. Despite the disparity, the trial court did not consider the difference mitigating. *Id.* at 71-72, 786 P.2d at 401-02. On appeal, we reversed, finding that, in an appropriate circumstance, disparity may qualify as a mitigating circumstance. *Id.* at 72, 786 P.2d at 402. Despite upholding the "heinous or depraved" aggravating circumstance, we found the dramatic disparity in sentences sufficient to require reduction of Marlow's sentence to life imprisonment. *Id.* Bearup urges the same result here.

¶61 We find this case more like *State v. Henry* (*Henry II*), 189 Ariz. 542, 944 P.2d 57 (1997), than *Marlow*. In *Henry II*, we faced a sentencing disparity similar to the one here. The defendant, Henry, received the death penalty while his codefendant - who Henry alleged committed the murder - pled guilty to attempted first degree murder and received a fifteen-year sentence. *Id.* at 551, 944 P.2d at 66; *State v. Henry* (*Henry I*), 176 Ariz. 569, 574-75, 863 P.2d 861, 866-67 (1993). We found two aggravating factors – (F)(2), a prior serious offense for armed robbery, and (F)(5), that the murder was

- 26 -

committed in expectation of pecuniary gain. *Henry II*, 189 Ariz. at 551, 944 P.2d at 66. We affirmed Henry's death sentence after finding that "the men's distinct criminal backgrounds were sufficient to justify the disparity in penalties." *Id.; see also Schurz*, 176 Ariz. at 50, 57, 859 P.2d at 160, 167 (holding that disparity between defendant's death sentence and co-perpetrator's sentence to a term of probation was "explain[ed] and justif[ied]" and given "little, if any, weight" because the co-perpetrator pled to a lesser felony offense and testified against defendant at trial, the crime was heinous, cruel, or depraved, and the jury rejected defendant's accomplice theory).

## C. Propriety of Death Sentence

¶62 The sentencing disparity in this case merits only limited weight as mitigation in light of the reasonable explanations for the disparity. Bearup's criminal history was more extensive than either Johnson's or Nelson's. The age difference between Bearup and Johnson is also significant: Bearup was twenty-four at the time of the murder, whereas Johnson was only nineteen. Nelson, meanwhile, received a lesser sentence based on her more limited role in the crimes. Furthermore, Johnson's and Nelson's testimony was vital to the State's case against Bearup. *See State v. Stokley*, 182 Ariz. 505, 523, 898 P.2d 454, 472 (1995) ("[W]here the difference in sentences is a result of appropriate plea bargaining, it may not

be considered in mitigation."). We conclude that procuring testimony was an appropriate consideration in the plea bargaining process. *See id.* at 524, 898 P.2d at 473.

¶63        Finally, Bearup asserts that despite the jury's determination that he was a major participant in the murder for purposes of the *Enmund/Tison* findings, we nevertheless should consider his relatively minor participation as a mitigating circumstance. We conclude, however, that although Bearup did not strike the death blows, he was not a minor participant in the crimes.

¶64        We also conclude that, under the circumstances of this case, Bearup's election not to present mitigating evidence during the penalty phase is not mitigating. We have searched the record to determine whether there is any mitigating evidence sufficiently substantial to call for leniency and conclude that there is not.

¶65        Meanwhile, the aggravating circumstances in this case were substantial. The State proved both the (F)(2) and (F)(6) aggravating factors, including all prongs of the (F)(6) factor. In light of the serious aggravating factors, we find that the limited mitigation is not sufficiently substantial to call for leniency.

## IV.  CONCLUSION

¶66        For the foregoing reasons, we affirm Bearup's

convictions and death sentence.

_____
Rebecca White Berch, Chief Justice

CONCURRING:

_____
Andrew D. Hurwitz, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
W. Scott Bales, Justice


_____
Ruth V. McGregor, Justice (Retired)

**APPENDIX**

**Claims Raised to Avoid Federal Preclusion**

Bearup raises the following thirteen challenges to the constitutionality of Arizona's death penalty scheme to avoid preclusion:

1. The death penalty is per se cruel and unusual punishment. Both the United States Supreme Court and this Court have rejected this argument. *Gregg v. Georgia*, 428 U.S. 153, 186-87 (1976); *Salazar*, 173 Ariz. at 411, 844 P.2d at 578; *State v. Gillies*, 135 Ariz. 500, 507, 662 P.2d 1007, 1014 (1983).

2. Execution by lethal injection is cruel and unusual punishment. This Court rejected this argument in *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

3. The death statute is unconstitutional because it fails to guide the sentencing jury. This Court rejected this argument in *State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991).

4. The statute unconstitutionally fails to require either cumulative consideration of multiple mitigating factors or that the jury make specific findings as to each mitigating factor. This Court rejected this argument in *State v. Gulbrandson*, 184 Ariz. 46, 69, 906 P.2d 579, 602 (1995), *State v. Ramirez*, 178 Ariz. 116, 131, 871 P.2d 237, 252 (1994), and *State v. Fierro*, 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990).

5. Arizona's statutory scheme for considering mitigating evidence is unconstitutional because it limits full consideration of that evidence. This Court rejected this argument in *State v. Mata*, 125 Ariz. 233, 242, 609 P.2d 48, 57 (1980).

6. Arizona's death statute insufficiently channels the sentencer's discretion in imposing the death sentence. This Court rejected this argument in *West*, 176 Ariz. at 454, 862 P.2d at 214, and *Greenway*, 170 Ariz. at 162, 823 P.2d at 31.

7. Arizona's death statute is unconstitutionally defective because it fails to require the State to prove that death is appropriate. This Court rejected this argument in *Gulbrandson*, 184 Ariz. at 72, 906 P.2d at 605.

8. The prosecutor's discretion to seek the death penalty unconstitutionally lacks standards. This Court rejected this argument in *Salazar*, 173 Ariz. at 411, 844 P.2d at 578.

9. The constitution requires proportionality review of a defendant's death sentence. This Court rejected this argument in *Salazar*, 173 Ariz. at 416, 844 P.2d at 583, and *State v. Serna*, 163 Ariz. 260, 269-70, 787 P.2d 1056, 1065-66 (1990).

10. There is no meaningful distinction between capital and non-capital cases. This Court rejected this argument in *Salazar*, 173 Ariz. at 411, 844 P.2d at 578.

11. Applying a death statute enacted after the Supreme Court's decision in *Ring II* violates the *ex post facto* clauses of the federal and state constitutions and A.R.S. § 1-244. This Court rejected this argument in *State v. Ring* (*Ring III*), 204 Ariz. 534, 545-47, ¶¶ 15-24, 65 P.3d 915, 926-28 (2003).

12. The death penalty is cruel and unusual because it is irrationally and arbitrarily imposed and serves no purpose that is not adequately addressed by life in prison. This Court rejected this argument in *Pandeli I*, 200 Ariz. at 382, ¶ 88, 26 P.3d at 1153, *vacated on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002), and *State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

13. Arizona's death penalty statute is unconstitutional because it requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist. Both the United States Supreme Court and this Court have rejected this argument. *Walton v. Arizona*, 497 U.S. 639, 648 (1990); *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996); *Bolton*, 182 Ariz. at 310, 896 P.2d at 850; *State v. Tucker* (*Tucker II*), 215 Ariz. 298, 160 P.3d 177 (2007).